IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2013

**STATE OF TENNESSEE v. KEITH C. BUCKALEW**

**Appeal from the Criminal Court for Sumner County**
**No. 2010-391     Dee David Gay, Judge**

**No. M2012-02356-CCA-R3-CD - Filed August 9, 2013**

The defendant, Keith C. Buckalew, was convicted by a Sumner County Criminal Court jury of solicitation of a minor to observe sexual conduct, a Class E felony, and assault, a Class B misdemeanor, and was sentenced to respective terms of four years and six months, to be served consecutively. On appeal, the defendant argues that: (1) the trial court erred in allowing the hearsay testimony of two minors under the excited utterance exception to the hearsay rule; (2) the trial court erred in failing to limit, in the second trial, the victim's testimony about the defendant's touching her breast; and (3) the trial court erred in failing to limit testimony of the State's witnesses regarding the defendant's consumption of alcohol. We conclude that the defendant has waived review of these claims and, accordingly, affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

William Bart Highers, Gallatin, Tennessee, for the appellant, Keith C. Buckalew.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle Consiglio-Young, Assistant Attorney General; Lawrence R. Whitley, District Attorney General; and Bryna L. Grant and Jayson C. Criddle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted on charges of solicitation of a minor to observe sexual conduct and sexual battery by an authority figure arising out of interactions with his

girlfriend's fourteen-year-old granddaughter.

## First Trial

At trial, the victim, testified that the defendant was dating her grandmother at the time of the incident, and she had known him as long as she could remember. She said that her relationship with the defendant was "fine" when she was younger, but "it started getting argumentative" as she got older and "towards the end it wasn't good." She explained that the defendant's drinking was the cause of their arguments and that she saw him drinking every time she was at her grandmother's house. She stated that, during that time period, she spent the night at her grandmother's house three or four times a week, and the defendant was generally there.

The victim testified that she and the defendant talked about various things, including her relationships with her mother and her boyfriend. One time the defendant asked her what she and her boyfriend "had done together," meaning whether they "had kissed, had sex, anything." She told the defendant that she and her boyfriend had "kissed and made-out." She recalled that, in response to her answer, the defendant said, "I had to stop myself because I started thinking of myself in his position . . . and doing that with you." She said that the defendant told her that she "had nice breasts" and "a nice butt or thighs." The comments made her feel "[v]ery uncomfortable," and no one else was in the room when he made the comments.

The victim testified that, on an evening in December 2009, she and the defendant were watching TV, while her grandmother cooked dinner. She was lying on the loveseat, and the defendant was lying on the couch covered with a quilt. She was texting her friends when the defendant called her name. He repeatedly called for her and said things like, "Just look at it. Just say you want to see it." She finally looked over, and the defendant "had the covers pulled back and his penis was out of his pants." She said he was "just holding [his penis]," but she "didn't keep looking at it long enough to . . . make any notes in [her] head of what it looked like. [She] just saw it long enough to glance away." She recalled that before the defendant showed her his penis, "[i]f [she] looked down in that general area there was an up and down movement under the blankets," leading her to believe the defendant was masturbating.

The victim said that after she saw the defendant's penis, she "jumped up" and loudly said to the defendant, "You're very disgusting, you're sick" and went into the back bedroom. After a few minutes, the victim's grandmother came to the back bedroom to talk to the victim. The victim did not tell her what had happened, only saying that the defendant "had said something disgusting, stupid, since he was drunk and that [she] didn't want to talk about

it. That is wasn't a big deal." About five to ten minutes after the incident, she sent text messages to her boyfriend and best friend to tell them what had happened. She said that she slept in the bed in the back bedroom with her grandmother that night, and the defendant slept on the couch in the living room.

The victim testified that the defendant was in Texas over the holidays, so the next time she saw him was the beginning of January. On the day he returned, she was at the house alone with him because her grandmother was at work. She stated that she was getting ready to go to her boyfriend's house and, as she was looking in a mirror, she asked the defendant if her hair looked better down or pulled back in a ponytail. She recalled that the defendant "came up behind [her] and . . . gave [her] a hug from behind but grabbed [her] left breast[] and said, 'I think you always look beautiful.'" She explained that the defendant had his left arm around her stomach and his right arm across her chest and "had a pretty firm grasp on [her] breasts." She "inched [her] way out of his [hold]" and said, "No, don't do that. No. Don't do that to me that's not right." About five minutes later, the victim's mother arrived to pick her up, but she did not tell her mother or her boyfriend about the incident.

The victim testified that she went back to her grandmother's house approximately ten times over the course of January, even though she knew the defendant would be there, because she was not happy at home. She explained that she was unhappy at home because she "was pretty much home alone" since her mother worked late hours, her grandfather did not talk, and her brother "never came out of his room." However, she had a close relationship with her grandmother and had, several months prior to the incidents, discussed the possibility of living with her permanently. She said that she would have "[a] lot more" private space at her grandmother's house. The victim said that her grandmother and the defendant argued but never "got physical in front of [her]."

On cross-examination, the victim acknowledged that she had wanted to move in with her grandmother and that she would not be able to do so as long as the defendant resided in the house. She said that there were three bedrooms in her mother's house, but she slept in the living room because the bedrooms were occupied by her mother, grandfather, and brother. Whereas, at her grandmother's house, there were two bedrooms and only her grandmother's cats occupied the second bedroom. She wanted to move in with her grandmother because she and her mother argued, and she "was lonely." Asked why she wanted to live somewhere a person who made comments about her breasts and buttocks was staying, the victim said, "I wouldn't put my focus on him. It was more spending time with my grandmother."

The victim identified a diagram of the layout of her grandmother's house and pointed out the location of the living room and the kitchen, where her grandmother was located

during the incident. She said that she remembered talking to a detective on the night of January 28, 2010, the night the defendant was charged, and giving the detective a statement. She admitted that she told the detective that she yelled at the defendant after the incident and that she told the detective that both incidents with the defendant, when he showed her his penis and when he touched her breasts, happened on the same night. She said that her statement to the detective was not accurate because "[t]hat night was very chaotic. My mind got really jumbled in the heat of it all and [I] wrote the wrong thing." She stated that her testimony at trial was accurate.

On redirect examination, the victim explained that she did not immediately tell her grandmother about the incident with the defendant because, several years earlier, she had told her grandmother about an incident that happened with the defendant, and her grandmother did not believe her. As a result, the victim's grandmother sent her home, and the victim did not see her for a year. The victim was afraid the same thing would happen if she told her grandmother about the December incident.

C.S., the victim's boyfriend at the time of the incident, testified that he had not previously met the defendant but had spoken to him once on the phone. He recalled that, when he spoke to the defendant on the phone, the defendant asked him, "What are your intentions with my granddaughter[?]" C.S. testified that, on the evening of December 19, 2009, sometime between 8:00 and 10:00 p.m., the victim sent him a text message that said: "OMG. [The defendant] just showed me his penis." C.S. replied, "[N]o way. That's crazy." He and the victim then continued to exchange text messages about the incident and how it happened.

S.K., the victim's best friend at the time of the incident, testified that she and the victim frequently communicated via text messaging and "[u]se[d] all caps, say OMG, [and] a lot of exclamation points or something like that" to express excitement, happiness, or shock. In December 2009, she received a text message from the victim that said, "OMG" and "explained that [the defendant] had show[n] her his penis and then she said it was nasty [and] . . . she had . . . a lot of exclamation points or something like that in the text message for sure." She proceeded to text with the victim about the incident.

The victim's grandmother testified that she and the victim had a "real close" relationship and that the victim spent "[a] lot of time" at her house. She said that she was in a relationship with the defendant for almost eleven years and, during that time, they lived together. She recalled that the defendant made comments about the victim "[a]ll the time," noting that he commented on "[h]er breasts, how she was a woman," as well as "[h]er butt, but her breasts mostly." The witness always said "something to him about it" and got "kind of irritated with him."

-4-

The victim's grandmother testified that, on the night of the incident, she was cooking in the kitchen and saw the victim lying on the loveseat in the living room, texting on her phone. She recalled that she heard the victim say something to the effect of "[t]hat's gross," jump up from the loveseat, and "stomp[]" through the kitchen and into the bedroom. She went into the bedroom and asked the victim what the defendant had said to her, and the victim "said something to the effect of he's just gross or something. So [the victim's grandmother] just left it alone."

She acknowledged that there were times the defendant was alone in the house with the victim. She admitted that the victim told her about something that happened with the defendant when she was seven or eight years old, but she did not believe the victim and removed her from the house.

On cross-examination, she acknowledged that the night the defendant was charged with the present offenses, she discovered that the defendant had an affair when he was in Texas. She stated that the victim was not a very truthful person when she was younger, but she considered her to be a truthful person now.

Officer Hunter Raymond with the Hendersonville Police Department testified that on January 28, 2010, he responded to a domestic disturbance call at the residence of the victim's grandmother. The defendant informed him that they had an argument concerning the defendant's drinking. He did not arrest either party, and he informed them that he would write a disturbance report.

Officer Raymond testified that he returned to the residence later that evening on another domestic disturbance call. While he was at the residence, he learned that a juvenile was involved. Officer Raymond did not speak with the victim, but the defendant told him that the disturbance call was the result of the victim's telling her grandmother that the defendant had touched her inappropriately and "show[n] his private parts." Officer Raymond noted that the defendant appeared to be intoxicated, and he continued to explain what the argument was about and deny the incident.

On cross-examination, Officer Raymond acknowledged that he did not indicate in either disturbance report that the defendant appeared to be intoxicated. He recalled that, when the victim first entered the room, she was "emotional and upset" and said, "He showed me his dick and he touched my boob[.]" Officer Raymond noted that the defendant always maintained his innocence.

Detective Neal Harris with the Hendersonville Police Department testified that he interviewed the victim and had her give a written statement. He said that "she just cranked

it out real quick. But her testimony [at trial] was consistent with the story that she provided me of what occurred that night when I interviewed her." Detective Harris said that he followed up with C.S. and S.K., and he found no inconsistencies with their statements. As a result of his investigation, Detective Harris obtained a warrant and arrested the defendant.

On cross-examination, Detective Harris acknowledged that he only obtained a warrant on the solicitation of a minor to observe sexual conduct charge. He explained, however, that the sexual battery by an authority figure charge was later added by the grand jury. Detective Harris acknowledged that the charges were based solely on testimonial evidence.

The forty-nine-year-old defendant testified that he did not expose himself to the victim on December 19, 2009, or any other day. He said that he went to Texas the morning of December 20, 2009, to visit family and did not return until January 3, 2010. He recalled that, on January 28, the police came to the house of the victim's grandmother two different times. The police came the first time because of an argument he and the victim's grandmother had regarding a letter that he received. After the officers left, "[t]hings calmed down" and he went to sleep on the couch. However, he was awakened by the victim's grandmother screaming and calling him names, then officers arrived at the house again. He said that night was the first time he heard about the accusations against him. He denied ever grabbing the victim's breast or complimenting her about her breasts or buttocks.

On cross-examination, the defendant admitted that, had the victim asked him if she should wear her hair up or down, he "could have said" that it did not matter because she always looked good to him. The defendant admitted that he had been drinking both times the police came to the victim's grandmother's house on January 28. The defendant acknowledged having two prior felony convictions – both for driving after having been declared a habitual traffic offender.

After deliberating, the jury could not reach a verdict on the solicitation of a minor to observe sexual conduct charge but convicted the defendant of the lesser-included offense of assault on the sexual battery by an authority figure charge.

**Second Trial**

A second trial was conducted on the first count, at which all of the same witnesses testified in essentially the same manner as the first trial. After the conclusion of the proof, the jury convicted the defendant, as charged, of solicitation of a minor to observe sexual conduct.

## ANALYSIS

The defendant argues that the trial court erred in allowing the hearsay testimony of C.S. and S.K. under the excited utterance exception to the hearsay rule; (2) the trial court erred in failing to limit, in the second trial, the victim's testimony about the defendant's touching her breast; and (3) the trial court erred in failing to limit testimony of the State's witnesses regarding the defendant's consumption of alcohol. The State argues, and we agree, that the defendant has waived review of these claims because they were not raised in his motion for new trial.

Although the defendant did, to some extent, raise these issues at trial, he did not include them in his motion for new trial. The defendant's motion for new trial is very brief, requesting a new trial "on the ground that the verdict was contrary to law and clearly against the evidence or, in the alternative, for an order in arrest of judgment, on the ground that the facts stated in the information do not state a crime[.]" We note that the State clearly raised waiver in its brief, and the defendant did not contest the State's assertion. Tennessee Rule of Appellate Procedure 3(e) provides, "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Id. Accordingly, we conclude that the defendant has waived consideration of these issues on appeal.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that these issues are waived and affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE